Michael D. MENEFEE, Appellant,

v.

The STATE of Texas, Appellee.

No. 06–05–00204–CR.

Court of Appeals of Texas, Texarkana.

Submitted Nov. 30, 2006.

Decided Dec. 28, 2006.

Lew Dunn, Law Office of Lew Dunn, Longview, for appellant.

W. Ty Wilson, Asst. Dist. Atty., Longview, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Chief Justice MORRISS.

Someone strangled Jacqueline James to death and left her body, naked and in an unnatural position, in her own bed. In a Gregg County jury trial, James' recent ex-boyfriend, Michael D. Menefee, was convicted of murdering James and was sentenced to forty-five years' imprisonment. Menefee appeals. His appeal largely centers on the question of whether the evidence supports his conviction.

Because we find that (1) the evidence is legally and factually sufficient to support the conviction, (2) the trial court did not err in admitting evidence of Menefee's fingerprints at the murder scene, (3) the State did not violate the rules of disclosure stated in *Brady v. Maryland*,[1] and (4) admitting the victim's hearsay statements did not affect Menefee's substantial rights, we affirm the trial court's judgment.

---

1. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*(1) The Evidence Is Legally and Factual-
ly Sufficient to Support the Conviction*

██ In four points of error, Menefee
challenges the sufficiency of the evidence
to support his conviction.[2]

██ Our factual sufficiency review
looks to all the evidence in a neutral light
and determines whether the evidence sup-
porting the verdict is so weak that the
jury's verdict is clearly wrong and mani-
festly unjust, or whether the great weight
and preponderance of the evidence is con-
trary to the verdict. *Watson v. State*, 204
S.W.3d 404 (Tex.Crim.App.2006); *Johnson
v. State*, 23 S.W.3d 1, 7 (Tex.Crim.App.
2000); *Clewis v. State*, 922 S.W.2d 126, 134
(Tex.Crim.App.1996). We review the legal
sufficiency of the evidence by determining
whether a rational trier of fact could have
found the essential elements of the crime
beyond a reasonable doubt after viewing
the evidence in a light most favorable to
the prosecution. *Cates v. State*, 102
S.W.3d 735, 738 (Tex.Crim.App.2003) (cit-
ing *Jackson*, 443 U.S. at 318–19, 99 S.Ct.
2781).

██ Menefee had a good alibi—that is,
until his alibi started unraveling. Menefee

maintained he was home with his current
girlfriend, Anita Owens, when James was
killed, not long after 1:00 a.m. January 15,
2004. Though Owens originally confirmed
Menefee's alibi to investigators, she later
recanted, relating at least two different
stories. Menefee's alibi was also de-
bunked by Menefee's former neighbor,
Craig Hawkes, who testified that on the
night of January 14 he had given Menefee
a ride to within six houses of James' home,
where she was later found dead. Owens
testified that later that same night, when
she thought Menefee was home, he called
her from a few blocks away from James'
house for a ride back to his house.

James' body was found the morning of
Friday, January 16, 2004, by family mem-
bers. Some degree of decomposition had
set in, leading to the conclusion she had
been dead for at least twelve hours and as
long as five days.[3] Three witnesses com-
mented on the cleanliness of James' home.[4]
Perhaps owing to such tidiness, forty-one
discrete fingerprints were found in James'
home. Several were identified as James'.
Although police compared prints found in
the home to those of Ruben Mananita
(James' coworker who had been in James'

---

**2.** Menefee's first four points of error assert
that (1) the evidence was legally insufficient
under state law, (2) the evidence of motive
was insufficient to support a conviction, (3)
the evidence to convict was legally insufficient
under federal law, and (4) the evidence was
factually insufficient under state law. Re-
garding point two, it is not necessary that the
evidence establish a conclusive motive for
murder. *Smith v. State*, 965 S.W.2d 509, 519
(Tex.Crim.App.1998). We construe point
three as a claim that the evidence is insuffi-
cient to meet the requirements of *Jackson v.
Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61
L.Ed.2d 560 (1979). Otherwise, as all these
points complain of the sufficiency of the evi-
dence, they will be addressed together.

**3.** Notwithstanding that broad range for the
possible time of death based on the condition

of the body, James had been alive and at work
the evening of January 14. Therefore, she
could not have been dead many days.

**4.** Neighbor Betty King said she had been in
James' house about three times and found
James to be a "very neat" housekeeper and it
was "very unusual ... wasn't like her" to
have one of the carpet runners in the hallway
kicked up; Detective Kirk Haddix, describing
his first entrance to James' home, said, "[t]he
house is pretty neat. It looks to be fairly
clean." Detective Seth Vanover said, "[t]he
house was really clean," and "[t]o be a homi-
cide scene it's awfully clean. It had been
picked up." Vanover said that, while he
knew Menefee had been in James' house be-
fore, he did not expect to find Menefee's fin-
gerprints "[b]ased on how clean the house
was, the way she kept it."

house within a week before the murder, and with whom she had lunch plans for Friday, January 16) and Rodney Frasier (an acquaintance of James about whom little is found in the record other than his name was found in James' purse)-neither matched. Two fingerprints on the headboard of James' bed were positively identified as Menefee's. Menefee admittedly had had a romantic relationship with James, but said he had last been in her house on Christmas 2003, about three weeks before her death.

When James' family members discovered her body, she was naked in her bed, with the covers pulled up to her chin. Longview police officers described the position of James' body as having her head "pushed up against the headboard in an unnatural position." James' "head was pushed up against the headboard, kind of cocked off to one side. Her left shoulder was sort of slanted to the left and pulled back behind her. Her left arm was up under her back. Her left hand was under her buttocks and actually sticking up between her legs and her right arm was laid over on top of her pubic area," and "her left leg was picked up to the left side also, bent at the knee." One officer opined it "appeared that someone had killed her and placed her in bed and covered her up." James' fingernails had been clipped very short, and twelve or thirteen nail clippings were found in the drain of her bathtub. Detective Dan Reigstad opined the nails had been cut postmortem; and pathologist Janice Townsend–Parchman testified that, had the nails been cut while James were still alive, it would have been "quite painful."

In the back of James' house, a bathroom window had been broken out, dirt was found on the toilet seat, and items in the area had been knocked over. Outside the bathroom window, in the yard, were imprints from shoes, from which castings were made. In the hallway of James' house, leading to her bedroom, was found a clump of hair consistent with a patch of missing hair on James' scalp; also in the hallway was a diamond earring stud matching the stud found in her left ear, apparently the stud missing from her right ear.

Police contacted Menefee the day James' body was found. Menefee agreed to accompany police to the station and be interviewed. According to Detective Vanover, Menefee said he knew that James was dead, but never asked officers what had happened to her. Vanover described Menefee's behavior that morning as extremely nervous, though not upset or distraught at the news of James' death. "[Menefee] was evasive, real short in his answers. He was visibly shaking," said Vanover of Menefee's demeanor. Menefee told Vanover that, on the night of Wednesday, January 14, he had been home with his girlfriend Anita Owens, who had left his place at 5:00 a.m. Thursday, January 15. Menefee acknowledged having dated and having had a sexual relationship with James, but denied harming her.

Initially, Owens corroborated Menefee's story. Between her initial statement to police following James' killing, though, and Menefee's trial, Owens changed her story at least twice. Her testimony at Menefee's trial came while she was under indictment for aggravated perjury,[5] and the trial

---

5. Owens admitted lying to the grand jury which indicted Menefee. Originally, Owens told police she had been with Menefee at his house from about 5:00 p.m. January 14 to about 5:00 a.m. January 15. Later, to the

grand jury, she altered her story and said she had gone to Wal–Mart about 1:30 a.m. to buy sleepwear and tampons. The State countered with testimony from a Wal–Mart employee, with register receipts and records, showing

court admonished her that her testimony could be used against her.

At trial, Owens said she was at Menefee's house the evening of January 14; she went to bed around 9:30 p.m., and Menefee was still up playing video games. Around 2:00 a.m. (January 15), Menefee telephoned Owens, asking her to pick him up at the intersection of Birdsong and Mobberly in Longview. From a map of the area introduced into evidence, this intersection appears to be approximately six to eight blocks from James' house. The State introduced cellular telephone records showing Menefee called Owens at 1:42, 2:37, and 2:38 a.m. January 15. Owens said that, when she brought Menefee home, he carried a bag with him.

Craig Hawkes, at the time of James' death, lived next door to Menefee. On January 14, Menefee asked Hawkes if Hawkes, around 10:30 p.m. that night, would give Menefee a ride to Menefee's mother's house. Menefee had never asked Hawkes for a ride before. Around 10:30 that night, Menefee came to Hawkes' door, dressed in a dark outfit and carrying some kind of travel bag. Menefee told Hawkes that he was going to his mother's house because Menefee had had a fight or trouble with his girlfriend. Hawkes thought it odd that Menefee would leave his own house rather than have the girlfriend leave. Hawkes also thought it odd that Menefee did not have Hawkes drop him at a specific location, which Hawkes offered, but rather at a street corner. Hawkes testified he thought he dropped Menefee around the corner of 12th and Raney. Raney does not appear on the maps intro-

duced in evidence. In the course of the investigation, Hawkes took a detective to the intersection where he had dropped Menefee. Detective David Cheatham testified that intersection was about six houses north of James' house. Another map shows that 1114 Hutchings, home of Menefee's mother, is about 1.1 miles from James' home.

The jury was presented with evidence that Menefee's fingerprints were found within inches of James' body, on the headboard of her bed. Menefee uncharacteristically asked his neighbor to take him to within a block of James' house at 10:30 at night, then later asked that neighbor not to tell anyone he had given Menefee that ride. Although Menefee claimed he had been with Owens all night on the night of January 14–15, she testified she had previously lied about being with Menefee, and in fact that he had called her in the wee hours of the morning to pick him up from the neighborhood of the murder.

Viewing this evidence in a light most favorable to the prosecution, we find a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The evidence is legally sufficient to support the jury's verdict.[6]

 Menefee appropriately emphasizes the circumstantial nature of the evidence in this case, and urges that there are other reasonable potential scenarios in which Menefee was not the killer. When the evidence suggests the existence of a reasonable alternative hypothesis, the reviewing court must consider it in our factual sufficiency analysis. *Harris v. State,*

---

no such sales had occurred at the time Owens claimed to have made her purchase.

**6.** As regards Menefee's arguments that there were alternative reasonable hypotheses pointing to another person being the killer, the Texas Court of Criminal Appeals has rejected

the reasonable hypothesis construct as a measure of legal sufficiency. *See Wilson v. State,* 7 S.W.3d 136, 141 (Tex.Crim.App. 1999); *Geesa v. State,* 820 S.W.2d 154, 161 (Tex.Crim.App.1991).

133 S.W.3d 760, 763–64 (Tex.App.-Texarkana 2004, pet. ref'd); *Richardson v. State,* 973 S.W.2d 384, 387 (Tex.App.-Dallas 1998, no pet.). The existence of an alternative reasonable hypothesis may be relevant to a factual sufficiency review, but the mere existence of such hypothesis is not determinative. *See Wilson,* 7 S.W.3d at 141. The mere existence of an alternative reasonable hypothesis does not render the evidence factually insufficient; the standard of review remains the same. *Richardson,* 973 S.W.2d at 387. A verdict may be overturned only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Escamilla v. State,* 143 S.W.3d 814, 817 (Tex.Crim.App.2004). We cannot reverse the verdict if reasonable minds could differ about the conclusions to be drawn from the evidence. *Scott v. State,* 934 S.W.2d 396, 399 (Tex.App.-Dallas 1996, no pet.).

Menefee points out that there was some evidence suggesting the killer took steps to clean up the scene: there was glass found in a wastebasket, which one detective, along with Menefee's trial counsel, speculated could have been from the broken bathroom window. Police were not able to positively identify the fingerprints found on an ammonia bottle behind the kitchen sink, nor on a dustpan in James' house. There was, however, still broken glass and dirt on the bathroom floor and dirt on the toilet seat.

Menefee makes much of fingerprints on the dustpan and ammonia bottle, saying these point to another perpetrator. But Detective Reigstad testified the dustpan prints were only "borderline" useable; he said some of the prints were not useable. Further, this hypothesis presumes the killer actually used the dustpan and ammonia bottle, for which there is no support[7] in the record. Menefee's hypothesis that these unidentified fingerprints belonged to the killer is not supported by any evidence.

Menefee posits the State should have obtained and conducted DNA analysis on Ruben Mananita, James' coworker, and Rodney Frasier, whose name was found in James' purse. He criticizes the State's failure to conduct comparisons of castings of the shoe prints found outside the broken bathroom window.[8] His defensive theory. was to raise inferences of other persons who could have committed the murder, or to raise doubt that Menefee was the killer. But nowhere does he point to any part of the record which could be said to constitute evidence to support these hypotheses. Police did compare Mananita's and Frasier's fingerprints to those found in James' house; none matched.

Menefee attacks the reasonableness of the time line proffered by the State, wherein James' whereabouts were accounted for until about 1:00 a.m. Thursday, January 15. Menefee relies on testimony from James' neighbor, Betty King, that another woman, Arnetta Simon, from King and James' neighborhood, had told King that Simon had seen James on Thursday, January 15. Menefee does not, however, assert that he made any attempt to get Simon's testimony at trial. This thirdhand allegation is hardly so contrary to the overwhelming weight of the rest of the

---

7. Or at best, inferential support: although shards of glass were found in a wastebasket, there was no evidence this glass was from the broken bathroom window, or that the dustpan had been used to gather the glass.

8. Menefee's videotaped interview conducted by the police the day James' body was found, and before Menefee was arrested, shows Menefee agreeing to provide his shoes for comparison with the footprints outside the bathroom window. It does not appear the police ever did that comparison.

evidence as to suggest that the verdict is clearly wrong and unjust.

▄▄▄ Menefee also asserts that King said she twice sent her son to put a note on James' door on January 15 and 16. Other witnesses[9] said that, when they went to the door of James' house the morning of the 16th, they saw no note. As with the reported statement of Simon, this is at most a conflict in testimony which, viewed in the context of all the evidence presented, does not render the verdict clearly wrong and unjust. The jury was free to weigh the evidence and reconcile any conflicts. *See Davis v. State,* 147 S.W.3d 554, 557 (Tex.App.-Waco 2004, no pet.) (noting jury free to disbelieve alibi testimony); *Lebleu v. State,* 192 S.W.3d 205, 210 (Tex.App.-Houston [14th Dist.] 2006, pet. ref'd) (jury to resolve conflicts in testimony and evaluate witness credibility).

Two batting gloves were found outside James' house, one stuck on top of a chain-link fence, one on the ground at the base of the fence. There was testimony that one glove had traces of DNA from two different people, neither of whom was James or Menefee. Both gloves were examined for traces of broken glass, without success.

James' fingernails had been cut back very close, and as many as thirteen nail clippings[10] were found in the drain of her bathtub. The clippings were tested for the presence of blood or other DNA samples other than that of James, again without success.[11] Only one of the actual nail clippings was tested, showing that it did indeed come from James.

Although these various points may be seen as loose ends surrounding James' death, we cannot say that there exists evidence, contrary to the conviction, so strong that the standard of proof, beyond a reasonable doubt, could not have been met, nor that the jury's verdict is clearly wrong and manifestly unjust. *Escamilla,* 143 S.W.3d at 817. The evidence was factually and legally sufficient to support the jury's verdict.

*(2) The Trial Court Did Not Err in Admitting Evidence of Menefee's Fingerprints at the Murder Scene*

Menefee also complains the trial court erred in admitting evidence of two of Menefee's fingerprints found on James' headboard. At trial, Menefee objected that he had not been told until about four days before trial that Menefee's fingerprints were identified as the ones on the headboard. He did not object that he did not receive notice the State had fingerprint evidence, only that he was not told his own prints were among those found.

Menefee's trial on the merits began August 16, 2005. Counsel for Menefee lodged an objection to the State's plan to introduce evidence that two of Menefee's fingerprints had been found on the headboard of James' bed, where her body was found. On March 10, 2005, the trial court had signed a discovery order, approved by attorneys for Menefee and the State, which had requested the defense be allowed to inspect "[a]ll fingerprints, palm

---

**9.** James' brother, who discovered her body; Ruben Mananita, who knocked on James' door the morning of January 16.

**10.** At one point, the clippings were referred to as "particles," which might explain why there seem to have been more clippings than James had fingers.

**11.** In the noncustodial videotaped interview, Menefee complied with the police request to raise his shirt on camera, demonstrating he had no visible scratches on his torso.

prints, foot prints, shoe, tire, or other prints ... which are related to the case at bar, and alleged to have some relation to the Defendant ... or shall be used by the Stated [sic] in trial on the merits of this case."

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *See Green v. State*, 934 S.W.2d 92, 101–02 (Tex.Crim.App.1996); *Montgomery v. State*, 810 S.W.2d 372, 379–80 (Tex.Crim. App.1990) (op. on reh'g). We will not reverse a trial court whose ruling was within the "zone of reasonable disagreement." *Green*, 934 S.W.2d at 102; *Montgomery*, 810 S.W.2d at 391.

We begin with the fact that Menefee was not denied discovery of the State's fingerprint evidence. While the record is not entirely clear, it seems clear enough that Menefee had been notified that part of the State's evidence included fingerprints. At the hearing where Menefee presented his objection to the trial court, Menefee characterized his objection as follows: "Well, our objection now is that it was not adequately provided in time for us to review the matter. It was not provided in any detail other than the fact that a fingerprint existed on the headboard prior to voir dire." The State purported to show the trial court a "lift log" of fingerprints from the scene and where they were located. The trial court stated, "So, [defense attorney]'s objection is that although this was timely provided, the information as to the match wasn't given to him until Thursday of last week?" Menefee's attorney answered, "That is correct."

Failure to effectuate discovery will not result in reversible error unless it can be shown that the evidence withheld would have affected the outcome of the trial in the defendant's favor. *Butler v.*

*State*, 736 S.W.2d 668, 672 (Tex.Crim.App. 1987) (no error in failing to divulge to defendant absence of fingerprints on knife) (citing *Quinones v. State*, 592 S.W.2d 933 (Tex.Crim.App.1980)). A defendant does not have a general right to discovery of evidence in the State's possession. *Quinones*, 592 S.W.2d at 940; *see* TEX.CODE CRIM. PROC. ANN. art. 39.14 (Vernon Supp. 2006). A defendant's right to discovery is limited to exculpatory or mitigating evidence. *Dickens v. Court of Appeals, Second Supreme Judicial Dist. of Tex.*, 727 S.W.2d 542, 551 (Tex.Crim.App.1987). Beyond that, the scope of discovery is within the trial court's discretion. TEX.CODE CRIM. PROC. ANN. ART. 39.14; *Quinones*, 592 S.W.2d at 940.

The State claims Menefee should have asked for a continuance, rather than exclusion of the proffered fingerprint evidence. There is support for this argument. *See Barnes v. State*, 876 S.W.2d 316, 328 (Tex. Crim.App.1994) (defendant claimed error because witness' name not furnished before trial, despite court order to do so; any error in allowing witness to testify, over defendant's claim of surprise, rendered harmless by defendant's failure to move for continuance); *Murray v. State*, 24 S.W.3d 881, 893 (Tex.App.-Waco 2000, pet. ref'd) (statement from cell mate wherein Murray confessed to crime obtained by State 5:30 Friday afternoon and faxed to Murray's attorney at 6:00 p.m. Friday before Monday trial; to preserve complaint that the late production of the statement resulted in unfair surprise, Murray required to request trial court continue the trial so he could review the newly-disclosed evidence); *see also Youens v. State*, 742 S.W.2d 855, 860 (Tex.App.-Beaumont 1987, pet. ref'd) (citing *Hubbard v. State*, 496 S.W.2d 924, 926 (Tex.Crim.App.1973)).

The trial court did not err in admitting evidence of Menefee's fingerprints found at the murder scene.

*(3) The State Did Not Violate the Rules of Disclosure Stated in Brady v. Maryland*

 Menefee complains the State violated the doctrine of *Brady*, which mandates that the State is required to provide potentially exculpatory information to the defense.[12] *See also Thomas v. State*, 841 S.W.2d 399 (Tex.Crim.App.1992). The Due Process Clause of the Fourteenth Amendment to the United States Constitution is violated when a prosecutor fails to disclose evidence which is favorable to the accused and that creates a probability sufficient to undermine the confidence in the outcome of the proceeding. *Id.* at 404. Further, the information must be disclosed to the accused in time to put it to effective use at trial. *See Palmer v. State*, 902 S.W.2d 561, 563 (Tex.App.-Houston [1st Dist.] 1995, no pet.). This includes disclosure of any favorable information in the possession of police agencies or other parts of the "prosecutorial team." *Ex parte Mitchell*, 977 S.W.2d 575, 578 (Tex.Crim. App.1998) (citing *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). A reasonable probability of a different result is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555.

 Menefee's complaint is that the State failed to develop evidence that might have been exculpatory or that might have supported a reasonable hypothesis of the guilt of another. Menefee complains that castings of shoe prints, found outside the bathroom with the broken window, and presumptively the point of entry for James' killer, were not compared to shoes belonging to Menefee or Ruben Mananita, a coworker of James who saw her the night she was killed and who had a lunch date with her set for Friday, January 16.

 Menefee, however, does not cite any authority saying the State had a duty to do such investigation or analysis. Menefee's argument is that a possibility exists that, if the shoe print castings had been compared to Mananita's shoes and if Mananita's DNA had been submitted to the Department of Public Safety crime laboratory, an alternative, reasonable hypothesis of James' killer might have been produced. Menefee has not demonstrated or shown any evidence which was known to the State but not Menefee and that was favorable to Menefee. The purpose of *Brady* "is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Hampton v. State*, 86 S.W.3d 603, 612 (Tex.Crim.App.2002) (quoting *United States v. Agurs*, 427 U.S. 97, 109–10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). Rather, the inquiry is whether the failure of the evidence's disclosure undermines confidence in the jury's verdict. *Lempar v. State*, 191 S.W.3d 230, 241 (Tex.App.-San Antonio 2005, pet. ref'd) (citing *Ex parte Richardson*, 70 S.W.3d 865, 870 n. 22 (Tex. Crim.App.2002)).

 Here, there has been no showing of any evidence that was withheld. *Brady* does not impose a duty on the State to provide facts known to or discoverable by the defendant. *See Havard v. State*, 800 S.W.2d 195, 204–05 (Tex.Crim.App.

12. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194.

1989). The State has no duty to seek out exculpatory information independently on the defendant's behalf. *Palmer v. State,* 902 S.W.2d 561, 563 (Tex.App.-Houston [1st Dist.] 1995, no writ) ("purpose [of *Brady* rule] is not to displace the adversary system") (quoting *Bagley,* 473 U.S. at 675, 105 S.Ct. 3375). Further, a *Brady* violation does not arise if the defendant, using reasonable diligence, could have obtained the information. *Westley v. Johnson,* 83 F.3d 714, 726 (5th Cir.1996).

Menefee cites *Brandley* as support for his argument that the State's "failure to develop evidence amounts to [a] violation of due process." *See Ex parte Brandley,* 781 S.W.2d 886 (Tex.Crim.App.1989). *Brandley* involved the State refusing to obtain and analyze DNA samples of other individuals seen near the scene of the crime and suppressing the fact that others were seen at or near the scene around the time of the murder. The Texas Court of Criminal Appeals concurred with the "trial court's finding that the State's investigation was flawed." *Id.* at 892. Weighing the cumulative effects of the State's poor investigation and the totality of the circumstances surrounding Brandley's conviction, the court found a violation of due process. *Id.* at 894. Menefee's case is distinguishable; there has been no finding of inadequate investigation and no evidence the State affirmatively misled Menefee or suppressed evidence. All of the evidence and theories asserted by Menefee were available to him to investigate at trial. Menefee has not demonstrated a violation of the *Brady* doctrine or a deprivation of due process.

 Menefee also claims error in the trial court's denial of a new trial on this basis. The granting or denying of a motion for new trial lies within the discretion of the trial court. We do not substitute our judgment for that of the trial court, but rather decide whether the trial court's decision was arbitrary or unreasonable. *Salazar v. State,* 38 S.W.3d 141, 148 (Tex.Crim.App.2001); *Lewis v. State,* 911 S.W.2d 1, 7 (Tex.Crim.App.1995). Based on the foregoing discussion concluding the State did not have a duty to investigate Menefee's defense or argue it, the trial court cannot be said to have abused its discretion in failing to grant a new trial.

*(4) Admitting Victim's Hearsay Statements Did Not Affect Menefee's Substantial Rights*

During the State's case-in-chief, it presented the testimony of James' neighbor, Betty King. King testified to about four statements made by James to King, regarding James' relationship with Menefee:

(a) James told King that James had been to Menefee's house where she found a woman (Owens), hiding in the closet. The woman ran from the house when James discovered her. James was upset and "real mad" and "angry" when she told King about it, the day it occurred.

(b) James asked King to take James to Menefee's house to retrieve James' car. At the time, James was "real upset" and "very angry."

(c) On or around New Year's Eve 2003, about two weeks before her death, James told King she'd broken up with Menefee. King described James as "a little mad" at that time.

(d) On January 4, 2004, James came to King's home to use the telephone. James called Longview police and told them Menefee was sitting on her porch. King said that, while this happened, James was not crying but was upset and appeared frightened.

 Menefee complains these statements did not properly fall within any

hearsay exception.[13] We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Green*, 934 S.W.2d at 101–02; *Montgomery*, 810 S.W.2d at 379–80; *see also Wall v. State*, 184 S.W.3d 730, 743 (Tex.Crim.App.2006) (trial court's admission of evidence under excited utterance exception reviewed for abuse of discretion).

We note, at the outset, that only two components of the four referenced bits of testimony contain hearsay. In item (a), the information that James had seen, hiding in a closet in Menefee's house, a woman who ran when discovered, and in item (c), the information that James had broken up with Menefee, are the hearsay elements.

 Hearsay testimony regarding the declarant's emotion or "mental feeling"[14] is admissible so long as it does not include a statement of memory or belief to prove the fact remembered or believed. *See Glover v. State*, 102 S.W.3d 754, 762–63 (Tex.App.-Texarkana 2002, pet. ref'd) (statements not admissible under Rule 803(3) because they went beyond state-

ments of declarant's emotional state to describe past acts). In *Salazar v. State*,[15] hearsay statements of two counselors were deemed properly admitted. The statements referred to comments made by child sexual assault victims who described feeling angry, afraid, frightened, alone, and helpless. The Fourteenth Court of Appeals held these statements to be admissible under Rule 803(3). *Salazar*, 127 S.W.3d at 362–63. *Also cf. Martinez v. State*, 17 S.W.3d 677, 688 (Tex.Crim.App. 2000) (declarant's statement she was afraid fit exception in 803(3)). In *McDonald v. State*,[16] the court found that the wife's statement to her mother that she had changed the locks at her home to protect herself from her husband was admissible as a "mental feeling," namely, fear; and thus was properly admitted under Rule 803(3). Under Rule 803(3), a witness is allowed to testify that a person was afraid of another person because such testimony would be considered a mental or emotional condition of the victim. *Buhl v. State*, 960 S.W.2d 927, 932 (Tex.App.-Waco 1998, pet. ref'd).

---

**13.** The State initially offered the statements under the authority of Article 38.36 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.36 (Vernon 2005). Following argument, objections, and reconsideration, the trial court admitted the testimony as either excited utterances or statements of then-existing emotional, physical, or mental conditions. Article 38.36, however, "in no way broadens or otherwise affects the rules of evidence which apply, or the way in which they apply in any given homicide case." *Bush v. State*, 958 S.W.2d 503, 505 (Tex.App.-Fort Worth 1997, no pet.) (quoting *Fielder v. State*, 756 S.W.2d 309, 318 (Tex. Crim.App.1988)). The State therefore had the burden to show that these statements qualified under an exception to the hearsay rule, to the extent they were hearsay.

**14.** The trial court's ruling was that, "I think these fall under these exceptions under 803—

two and three. If that's the basis of your objection I do agree with you, they have to have an independent basis for their admissibility other than 38[.]36, but I think the State's established that." The trial court did not specifically state its decision was based on either excited utterance or then-existing mental condition; however, the basis of the court's ruling is irrelevant to our determination. If a trial court's decision to admit certain testimony is correct on any theory or law applicable to the case, we will uphold its decision. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App.1990) (en banc).

**15.** 127 S.W.3d 355 (Tex.App.-Houston [14th Dist.] 2004, pet. ref'd).

**16.** 911 S.W.2d 798, 806 (Tex.App.-San Antonio 1995, pet. dism'd).

■ But it is not permissible to admit hearsay evidence regarding facts that reveal *why* the person was afraid. *Skeen v. State*, 96 S.W.3d 567, 576 (Tex.App.-Texarkana 2002, pet. ref'd) (statements of victim that defendant had been partying, tearing things up, and smoking marihuana, are beyond the mental or emotional condition exception); *Buhl*, 960 S.W.2d at 933 (distinguishing between statements showing mental or emotional condition of fear, and such statements being offered to prove truth that victim had pulled guns on defendant); *see also Pena v. State*, 864 S.W.2d 147, 149 (Tex.App.-Waco 1993, no pet.) (testimony victim wanted to leave defendant but felt economically trapped was offered to show victim's state of mind, not to prove truth of victim's statements); *Williams v. State*, 927 S.W.2d 752, 764–65 (Tex.App.-El Paso 1996, pet. ref'd) (victim's statements to her mother regarding fear husband would hurt mother or daughter revealed only state of mind).

■ While the conduct and statements of James, as related by neighbor King, can be characterized as statements revealing James' mental or emotional condition,[17] there are also hearsay elements that at least arguably are beyond the mental or emotional condition exception. But, because any error in their admission would not have affected Menefee's substantial rights, we need not determine whether the admission of any portion of the challenged testimony was error.

The import of the hearsay components in the challenged testimony—James finding a woman in Menefee's closet, the woman running away when discovered, and James and Menefee breaking up—was essentially that the relationship between James and Menefee was strained or broken. That import was already in the record, even without the hearsay testimony. Menefee, himself, in a videotaped interview placed before the jury, admitted that he and James had had recent difficulty in their relationship and that he had been told, about two weeks before James' death, that James did not want to see him and that he should let things "cool off." We conclude that admitting the challenged hearsay testimony, even if error, did not affect Menefee's substantial rights. Therefore, any such error must be disregarded. *See* TEX.R.APP. P. 44.2(b).

We affirm the trial court's judgment.

---

17. Having come from Menefee's house where James found a woman hiding in a closet, King described James as "real angry" and "upset." King said she could "tell in [James'] voice she was hurt." King said James related the incident to her the day of its occurrence. King said about a week later, James came to King's house asking a favor. James asked King to take James to Menefee's house to retrieve James' car. King described James as "real upset" and "very angry that day."

About a month later, on New Year's Eve, shortly before James was killed, King said she "could tell in [James'] voice that she was a little mad" when she told King that James had broken up with Menefee. "[James] was the type person she never just let on—you had to ease in the conversation to ask her something," King explained. Finally, on January 4, James came to King's house to use the telephone. James had discovered Menefee sitting on James' porch. King said James was "upset" and "appeared to be scared because [James] said she came out the side window and ran around to the back of the house to come" to King's.