

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-20-00101-CR
_____

MICHAEL D. MENEFEE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 188th District Court
Gregg County, Texas
Trial Court No. 32,636-A

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Burgess

# MEMORANDUM OPINION

In 2005, Michael D. Menefee was convicted by a Gregg County jury of the murder of Jacqueline James and sentenced to forty-five years' imprisonment. This Court has previously affirmed that conviction. *Menefee v. State*, 211 S.W.3d 893 (Tex. App.—Texarkana 2006, pet. ref'd.). In 2019, Menefee sought post-conviction DNA testing of sets of fingerprints taken at the crime scene and found on a dustpan and an ammonia bottle. The trial court denied the motion. On appeal, Menefee asserts that the trial court erred because (1) he met all the procedural requirements for DNA testing, (2) he has shown by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing, and (3) under the principles of res judicata and collateral estoppel, the trial court was bound by its prior decisions that he had established by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing. Because we find that (1) Menefee has not shown by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing of the dustpan and ammonia bottle and (2) Menefee has not preserved his res judicata and collateral estoppel issues, we affirm the trial court's order.

## I. Background

### A. At Trial

Our opinion from Menefee's appeal of his conviction detailed the facts produced at trial. *Id.* at 897–900. Only the facts relevant to Menefee's current DNA appeal are included in this opinion.

James' body was found the morning of Friday, January 16, 2004, by family members. Some degree of decomposition had set in, leading to the conclusion she had been dead for at least twelve hours and as long as five days. Three witnesses commented on the cleanliness of James' home. Perhaps owing to such tidiness, forty-one discrete fingerprints were found in James' home. Several were identified as James'. Although police compared prints found in the home to those of Ruben Mananita (James' coworker who had been in James' house within a week before the murder, and with whom she had lunch plans for Friday, January 16) and Rodney Frasier (an acquaintance of James about whom little is found in the record other than his name was found in James' purse)-neither matched. Two fingerprints on the headboard of James' bed were positively identified as Menefee's. Menefee admittedly had had a romantic relationship with James, but said he had last been in her house on Christmas 2003, about three weeks before her death.

When James' family members discovered her body, she was naked in her bed, with the covers pulled up to her chin. . . . One officer opined it "appeared that someone had killed her and placed her in bed and covered her up."

*Id.* at 897–98. "In the back of James' house, a bathroom window had been broken out, dirt was found on the toilet seat, and items in the area had been knocked over." *Id.* at 898. In addition, broken glass, sponges, and other items had been knocked on the bathroom floor. In the kitchen, investigators found a dustpan, an ammonia bottle, and a trash can that contained some glass that, on visual inspection, appeared to be similar to the broken glass found in the bathroom. Although fingerprints were found on the dustpan and the ammonia bottle, investigators were not able to match them to Menefee, Mananita, or Frasier.

Police contacted Menefee the day James's body was found. Menefee agreed to accompany police to the station and be interviewed. According to Detective Vanover, Menefee said he knew that James was dead, but never asked officers what had happened to her. Vanover described Menefee's behavior that morning as extremely nervous, though not upset or distraught at the news of James's death. "[Menefee] was evasive, real short in his answers. He was visibly

3

shaking," said Vanover of Menefee's demeanor. Menefee told Vanover that, on the night of Wednesday, January 14, he had been home with his girlfriend, Anita Owens, who had left his place at 5:00 a.m., Thursday, January 15. Menefee acknowledged having dated and having had a sexual relationship with James but denied harming her.

Initially, Owens corroborated Menefee's story. Between her initial statement to police following James' killing, though, and Menefee's trial, Owens changed her story at least twice. Her testimony at Menefee's trial came while she was under indictment for aggravated perjury, and the trial court admonished her that her testimony could be used against her.

At trial, Owens said she was at Menefee's house the evening of January 14; she went to bed around 9:30 p.m., and Menefee was still up playing video games. Around 2:00 a.m. (January 15), Menefee telephoned Owens, asking her to pick him up at the intersection of Birdsong and Mobberly in Longview. From a map of the area introduced into evidence, this intersection appears to be approximately six to eight blocks from James' house. The State introduced cellular telephone records showing Menefee called Owens at 1:42, 2:37, and 2:38 a.m. January 15. Owens said that, when she brought Menefee home, he carried a bag with him.

Craig Hawkes, at the time of James' death, lived next door to Menefee. On January 14, Menefee asked Hawkes if Hawkes, around 10:30 p.m. that night, would give Menefee a ride to Menefee's mother's house. Menefee had never asked Hawkes for a ride before. Around 10:30 that night, Menefee came to Hawkes' door, dressed in a dark outfit and carrying some kind of travel bag. Menefee told Hawkes that he was going to his mother's house because Menefee had had a fight or trouble with his girlfriend. Hawkes thought it odd that Menefee would leave his own house rather than have the girlfriend leave. Hawkes also thought it odd that Menefee did not have Hawkes drop him at a specific location, which Hawkes offered, but rather at a street corner. Hawkes testified he thought he dropped Menefee around the corner of 12th and Raney. Raney does not appear on the maps introduced in evidence. In the course of the investigation, Hawkes took a detective to the intersection where he had dropped Menefee. Detective David Cheatham testified that intersection was about six houses north of James' house. Another map shows that 1114 Hutchings, home of Menefee's mother, is about 1.1 miles from James' home.

4

*Id.* at 898–99. The evidence also showed that, less than two weeks before the murder, the police had been called to James's house, where they gave Menefee a criminal trespass warning and took him from the premises. The jury found Menefee guilty of murder and assessed a sentence of forty-five years' imprisonment.

### B.    Post-Conviction Procedural History

Menefee appealed his conviction and alleged, among other things, that insufficient evidence supported his murder conviction. We found that there was legally sufficient evidence based on

> [the] evidence that Menefee's fingerprints were found within inches of James' body, on the headboard of her bed. Menefee uncharacteristically asked his neighbor to take him to within a block of James' house at 10:30 at night, then later asked that neighbor not to tell anyone he had given Menefee that ride. Although Menefee claimed he had been with Owens all night on the night of January 14–15, she testified she had previously lied about being with Menefee, and in fact that he had called her in the wee hours of the morning to pick him up from the neighborhood of the murder.

*Id.* at 899. While the appeal of his conviction was pending, Menefee filed his first motion for DNA testing and sought, and the trial court granted, DNA testing of a hair that had been found on the victim's blanket, the victim's fingernail clippings,[1] a drain water sample, and a hair that had been found on a towel. In its order, the trial court found that Menefee "would not have been convicted if exculpatory results had been obtained through DNA testing." Also, while his appeal was pending, Menefee filed his second motion for an order to compel the development and

---

[1]"James' fingernails had been clipped very short, and twelve or thirteen nail clippings were found in the drain of her bathtub. Detective Dan Reigstad opined that the nails had been cut postmortem, and pathologist Janice Townsend-Parchman testified that, had the nails been cut while James were still alive, it would have been "quite painful." *Menefee*, 211 S.W.3d at 898.

5

analysis of DNA evidence, and a supplemental motion seeking forensic DNA testing. On agreement of the parties, the trial court entered its order for further DNA testing of the hair from the victim's blanket and the hair found on a towel, and DNA testing of two batting gloves found outside of James's house, a hair specimen from James, and a hair specimen from Menefee. The trial court did not make any findings to support that order.

In 2008, after the appeal of his conviction was final, and in conjunction with an application for a writ of habeas corpus, Menefee filed a motion seeking a comparison of the fingerprints taken from the dustpan and the ammonia bottle with state and national databases. The trial court granted the motion and ordered that the fingerprint samples be forwarded to the Texas Department of Public Safety (TDPS) for examination, comparison, and analysis with its database and then forwarded to the fingerprint analysis unit at the Federal Bureau of Investigation (FBI) for examination, comparison, and analysis within the Integrated Automated Fingerprint Identification System, which is maintained by the FBI. The FBI examination of the fingerprints found no identification.

## C. Menefee's Request for DNA Testing of the Fingerprints

In 2019, Menefee filed a motion for further testing of fingerprint evidence in which he sought to have the fingerprint samples taken from the dustpan and ammonia bottle subjected to "touch DNA" analysis, which was not available at the time of trial. Menefee attached the affidavit of Michael J. Spence, Ph.D., who testified that it was feasible to obtain unique DNA profiles from latent print tape lift samples and outlined a proposed DNA testing strategy. In its response, the State argued that Menefee could not show by a preponderance of the evidence that

he would not have been convicted if exculpatory results were obtained through DNA testing. The State pointed to the other evidence of Menefee's guilt and also pointed out that there was no evidence that the dustpan or the ammonia bottle had been handled by the perpetrator. The State also contended that the fingerprint lift samples had more than likely been contaminated as a result of the detective lifting the fingerprint samples, as he had used the same fingerprint brushes and powder cannister to lift thousands of fingerprint samples without cleaning or sterilizing the brushes. This contention was supported by the affidavit of Detective Reigstad.

At the hearing on Menefee's motion, Spence explained that the average person sheds approximately two million cells per minute from their entire body surface so that, when a person touches something, there is a high likelihood that there is a transfer of skin cells. Consequently, if the person leaves a fingerprint on a surface, there is a good chance that biological material will be there. Spence also explained that DNA testing had advanced in recent years so that even trace amounts of biological material could yield a full DNA profile. Spence also testified that the only way to determine whether the fingerprint lift samples were contaminated was to do the DNA test. However, on cross-examination, Spence testified that, if there was routine contamination of the brush as Reigstad described, there would be an array of DNA signals that would be rendered completely useless by the fact that it was a mixture and that, even if there were just a few cells from a few dozen people, a true DNA profile could not be obtained. He cautioned, however, that this would have to be found out in testing. The trial court also received Reigstad's affidavit testimony into evidence. Later, the trial court denied the motion and found that Menefee had

7

failed to establish, by a preponderance of the evidence, that he would not have been convicted if exculpatory results had been obtained through DNA testing.

## II.    Requirements for Post-Conviction DNA Testing

As applicable to this case,

[a] convicted person may submit to the convicting court a motion for forensic DNA testing of evidence that has a reasonable likelihood of containing biological material[,][2] . . . was secured in relation to the offense that is the basis of the challenged conviction and was in the possession of the state during the trial of the offense, but . . . was not previously subjected to DNA testing.

TEX. CODE CRIM. PROC. ANN. art. 64.01(a-1), (b)(1).

The trial court may order DNA testing of the evidence only if it finds that:

(A)    the evidence[] (i) still exists and is in a condition making DNA testing possible; and (ii) has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect;

(B)    there is a reasonable likelihood that the evidence contains biological material suitable for DNA testing;[]

(C)    identity was or is an issue in the case; and

[D]    the convicted person establishes by a preponderance of the evidence that:  [i] the person would not have been convicted if exculpatory results had been obtained through DNA testing; and [ii] the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice.

TEX. CODE CRIM. PROC. ANN. art. 64.03(a)(1)–(2).

---

[2]"Biological material" includes "an item that is in possession of the state and that contains blood, semen, hair, saliva, skin tissue or cells, fingernail scrapings, bone, bodily fluids, or other identifiable biological evidence that may be suitable for forensic DNA testing; and . . . includes the contents of a sexual assault evidence collection kit."  TEX. CODE CRIM. PROC. ANN. art. 64.01(a).

8

## III.    Standard of Review

In our review of a trial court's ruling on a Chapter 64 motion, "we give almost total deference to the judge's resolution of historical fact issues supported by the record and application[]-of-law-to-fact issues turning on witness credibility and demeanor." *Reed v. State*, 541 S.W.3d 759, 768 (Tex. Crim. App. 2017) (citing *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997))). However, "we review de novo all other application-of-law-to-fact questions." *Id.* at 768–69 (citing *Rivera*, 89 S.W.3d at 59) (citing *Guzman*, 955 S.W.2d at 89)).

## IV.    Analysis

### A.    Menefee's Res Judicata and Collateral Estoppel Issues Were Not Preserved

In his third and fourth issues, Menefee argues that the trial court erred in finding that he had not established by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained from the fingerprint samples through DNA testing. Menefee points to the two prior orders[3] of the trial court that granted his motions for DNA testing of other items recovered at the crime scene and contends that, in those orders, the trial court found that he had established that he would not have been convicted if exculpatory results had been obtained from those other items through DNA testing. Thus, he argues, the trial court was precluded from relitigating this issue with regard to the fingerprint samples. The State

---

[3]Although Menefee also points to the trial court's order granting his motion to have the fingerprint samples examined and compared by TDPS and the FBI, he does not argue that this order supports his res judicata and collateral estoppel issues.

9

argues, among other things, that, because Menefee did not present those issues to the trial court, he has failed to preserve them for appeal. We agree.

Generally, "[t]o preserve a complaint for our review, a party must first present to the trial court a timely request, objection, or motion stating the specific grounds for the desired ruling if not apparent from the context." *Sharper v. State*, 485 S.W.3d 612, 615 (Tex. App.—Texarkana 2016, pet. ref'd) (quoting *Lee v. State*, No. 06-15-00004-CR, 2015 WL 5120243, at *1 (Tex. App.—Texarkana Sept. 1, 2015, pet. ref'd) (mem. op., not designated for publication) (citing TEX. R. APP. P. 33.1(a)(1))). "Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule." *Id.* (quoting *West v. State*, 121 S.W.3d 95, 114 (Tex. App.—Fort Worth 2003, pet. ref'd) (citing TEX. R. APP. P. 33.1(a)(2))). This Court, and several of our sister courts of appeals, have recognized that a claim of res judicata or collateral estoppel must be asserted in the trial court to preserve the claim for appellate review. *Jaykus v. State*, No. 05-13-01497-CR, 2014 WL 3339544, at *2 (Tex. App.—Dallas July 28, 2014, no pet.) (mem. op., not designated for publication);[4] *Gonzalez v. State*, 301 S.W.3d 393, 400 (Tex. App.—El Paso 2009, pet. ref'd); *Chavez v. State*, No. 01-06-00357-CR, 2007 WL 4465539, at *3 (Tex. App.—Houston [1st Dist.] Dec. 20, 2007, no pet.) (mem. op., not designated for publication); *Murphy v. State*, 200 S.W.3d 753, 758 n.3 (Tex. App.—Texarkana 2006), *aff'd*, 239 S.W.3d 791 (Tex. Crim. App. 2007); *Hughes v. State*, 16 S.W.3d 429, 431 (Tex. App.—Waco 2000, no pet.).

---

[4]"Although unpublished cases have no precedential value, we may take guidance from them 'as an aid in developing reasoning that may be employed.'" *Rhymes v. State*, 536 S.W.3d 85, 99 n.9 (Tex. App.—Texarkana 2017, pet. ref'd) (quoting *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd)).

In the trial court, Menefee did not assert res judicata or collateral estoppel in his motion or in his arguments at the hearing on the motion. In addition, although Menefee filed a motion for a retrial and asserted that the trial court had erred in its finding that he failed to establish by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing, he did not assert either res judicata or collateral estoppel as the basis of the trial court's error. Based on this record, we find that Menefee has not preserved these issues for our review. We overrule Menefee's third and fourth issues.

**B.      Menefee Failed to Establish by a Preponderance of the Evidence that He Would Not Have Been Convicted if Exculpatory Results Were Obtained through DNA Testing of the Fingerprint Samples**

To be entitled to DNA testing of the fingerprint samples, Menefee was required to "show by a preponderance of the evidence—a greater than 50% likelihood—that he would not have been convicted if the proposed testing's exculpatory results were available at the time of his trial." *Reed*, 541 S.W.3d at 774 (citing TEX. CODE CRIM. PROC. ANN. art. 64.03(a)(2)(A); *Holberg v. State*, 425 S.W.3d 282, 286–87 (Tex. Crim. App. 2014)). In his second issue, Menefee argues that the trial court erred in finding that he failed to meet this requirement. "For purposes of this inquiry we must assume (without deciding, of course) that the results of all of the post-conviction DNA testing to which [Menefee] is entitled under Article 64.01(b) would prove favorable to him." *Id.* (quoting *Ex parte Routier*, 273 S.W.3d 241, 257 (Tex. Crim. App. 2008)). "'Exculpatory results' means only results excluding the convicted person as the donor of this material." *Id.* (citing *Holberg*, 425 S.W.3d at 287).

11

In support of his argument that he met this requirement, Menefee argues, as he did in his original appeal, that the fingerprints on the dustpan and ammonia bottle point to another perpetrator. This hypothesis relies on his contention that Reigstad testified that the dustpan "was used in cleaning up the crime scene—sweeping up glass from the broken window and placing it in the waste basket." However, this mischaracterizes Reigstad's testimony. Our review of his testimony shows that Reigstad agreed with defense counsel's speculation that it appeared that the perpetrator tried to clean up the place and that it was reasonable to assume that the killer took the broom and dustpan, cleaned up some of the glass, and put it in the trash can. As we previously pointed out, this was speculation on the part of both Reigstad and defense counsel, for which there was no support in the record.[5] *Menefee*, 211 S.W.3d at 900. "Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007).

Since Menefee's contention that the fingerprints on the dustpan belonged to the perpetrator is based on speculation, not evidence, he failed to establish that the dustpan was connected to James's murder. Further, Menefee has pointed to no evidence in the record, and we have found none, that shows that the ammonia bottle was connected to the murder. Consequently, even if the DNA testing of these items resulted in the same genetic profile, we fail to see how this would have raised sufficient enough doubt for the jury to acquit Menefee. *See Reed*, 541 S.W.3d at 775.

---

[5]This speculation ignores the evidence that there were shards of glass from the broken bathroom window, and other items, on the bathroom floor and that there was dirt on the toilet seat. It also ignores the evidence that the kitchen trash can, the dustpan, and the ammonia bottle were found in the kitchen, not the bathroom.

Nevertheless, Menefee argues that, because of the lack of evidence directly tying him to the murder, if the DNA testing showed that the fingerprints on the dustpan and the ammonia bottle belonged to Mananita or some unknown third person, it would show that another person was present and would tend to show his innocence. We disagree. The presence of the redundant profile on the dustpan and the ammonia bottle does nothing to connect these items to the murder because the DNA analysis cannot determine when the fingerprints were placed on the items. In addition, the redundant profile on the two items found in the kitchen would not affect the other circumstantial evidence linking Menefee to the murder: (1) the presence of his fingerprints on the headboard within inches of James's body; (2) Menefee asking his neighbor to drop him off within a block of James's house at 10:30 at night and to not tell anyone he had; (3) Menefee telling his neighbor that he was going to his mother's house; (4) his claiming he had stayed all night with Owens, who initially confirmed his alibi, but ultimately testified that he had called her at 2:00 in the morning to pick him up in the vicinity of the murder; and (5) the telephone records that supported Owens's account and belied Menefee's.

Based on this record, we find that Menefee failed to show by a preponderance of the evidence that he would not have been convicted if exculpatory results obtained from the fingerprint samples were available at the time of his trial. *See Reed*, 541 S.W.3d at 774. Consequently, we find that the trial court did not err in so finding. We overrule Menefee's second issue.[6]

---

[6]Because our resolution of this issue is dispositive of this appeal, we do not address Menefee's remaining issue.

**D.      Disposition**

For the reasons stated, we affirm the trial court's order denying Menefee's Chapter 64 motion.

                                        Ralph K. Burgess
                                        Justice

Date Submitted:      April 13, 2021
Date Decided:        July 22, 2021

Do Not Publish

14